### KRAUSZ et al. v. UNITED STATES.*
#### No. 42802.

Court of Claims.
April 6, 1936.

*Motion for new trial overruled 15 F.Supp. 351.

This case having been heard by the Court of Claims, the court, pursuant to the stipulation of the parties, makes the following special findings of fact:

1. Salo Cohn, a citizen of Austria and resident of Vienna, Austria, died testate at Vienna, Austria, on April 25, 1917. At the time of his death he was in possession of securities which were physically situated in the United States, the value of which was $974,506.21. After the death of Salo Cohn, all the said securities were seized and administered by the Alien Property Custodian under the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix.

2. On November 24, 1928, the Commissioner of Internal Revenue notified the Alien Property Custodian of federal estate taxes due on the estate of Salo Cohn in the amount of $57,172.97 and demanded payment thereof. This amount was paid by the Alien Property Custodian on January 31, 1929. An assessment was entered by the Commissioner of Internal Revenue covering this payment on the January 1929 Miscellaneous Tax List at page 302, line 8 thereof. On October 11, 1929, the Commissioner of Internal Revenue notified the Alien Property Custodian of an additional federal estate tax due on the estate of Salo Cohn in the amount of $2,415 and demanded payment thereof. This amount was paid by the Alien Property Custodian on November 18, 1929. Assessment was entered by the Commissioner of Internal Revenue covering this payment on the December 1929 Miscellaneous Tax List. The Alien Property Custodian paid to the Collector of Internal Revenue at Baltimore, Md., the total amount of $59,587.97 as estate taxes on the estate of Salo Cohn from the seized property of the estate of Salo Cohn.

3. On February 4, 1929, a federal estate tax return on Form 706, executed by Dr. Max Hitschmann of Vienna, as executor of the estate of Salo Cohn, was filed by him with the Alien Property Custodian at the latter's request. On February 6, 1929, this return was filed by the Alien Property Custodian with the Collector of Internal Revenue at Baltimore, Maryland. This is the only estate tax return filed for the estate of Salo Cohn.

4. A claim for refund of the total estate taxes paid by the Alien Property Custodian in the amount of $59,587.97 was filed on behalf of the estate of Salo Cohn by the Alien Property Custodian with the Collector of Internal Revenue at Baltimore, Md., on August 6, 1932. This claim for refund was rejected by the Commissioner of Internal Revenue under date of September 8, 1932. Application to reopen the claim for refund was denied by the Commissioner of Internal Revenue by letter dated January 30, 1934.

5. The plaintiffs, Marianne Krausz and Paul Hohenau, are now and have always been citizens of Austria and now reside in Austria. They are the only children of Salo Cohn, deceased, and are the sole owners of and have not assigned the claim herein referred to. If the estate tax paid as aforesaid shall be deemed by this court to constitute an overpayment, Marianne

Krausz and Paul Hohenau are the proper parties plaintiff to recover jointly the amount of the overpayment.

Richard H. Wilmer, of Washington, D. C. (Douglas L. Hatch, of Washington, D. C., on the brief), for plaintiffs.

Elizabeth B. Davis, of Washington, D. C., and Robert H. Jackson, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge.

Salo Cohn, a citizen of Austria, died on April 25, 1917. At the time of his death he was in possession of securities kept in the United States the value of which was $974,-506.21. After his death these securities were seized and administered by the Alien Property Custodian under the Trading with the Enemy Act, as amended, 50 U.S.C.A. Appendix.

In the years 1928 and 1929, the Commissioner of Internal Revenue notified the Alien Property Custodian of federal estate taxes due on the estate of Salo Cohn in the total amount of $59,587.97, and in 1929 entered two assessments covering these taxes. The Alien Property Custodian, in 1929, paid the total amount of these taxes in accordance with the notices received from the Commissioner. No return was ever filed for the federal taxes on the estate of Salo Cohn except one filed on February 4, 1929, executed by one of the executors of the estate at the request of the Alien Property Custodian and filed in the office of the Custodian. On August 6, 1932, the Alien Property Custodian filed a claim for refund of the estate taxes paid by him on behalf of the estate in the amount of $59,587.-97. The claim for refund having been rejected by the Commissioner, this suit is now brought to recover the amount thereof.

Plaintiffs' suit is based upon the claim that all of the provisions of the revenue laws with reference to assessment and collection of federal taxes together with all of the provisions with reference to refunds of taxes illegally or erroneously collected are applicable to their cause of action. We think this theory cannot be sustained when the peculiar facts of the situation are considered in connection with the special statutes applicable.

In order to clearly set forth the extraordinary conditions which prevailed during the period involved in the case and the special statutes which were enacted to meet these conditions, it is necessary to make a brief historical review.

At the time the United States became a participant in the World War, German Nationals owned property situated or kept within the United States to the value of about $245,000,000. This property was of almost every description including money, securities, patents, ships, radio stations, etc. Besides this, there was a very large amount of property belonging to Austrians and Hungarians. Congress passed what is known as the Trading with the Enemy Act, which, among other things, authorized the seizure of this property and placed it in charge of an officer called the Alien Property Custodian. After the war ended the question arose as to what disposition should be made of the properties so held. There had been an old treaty with Prussia long before it became a part of the German Empire which provided that in case of war between the two countries the private property of the warring nationals should not be confiscated. Although this treaty no longer controlled, the rule expressed in it came to be regarded in the United States at least as a sound principle of international law, and consequently the German owners of this property were knocking persistently at the doors of Congress asking that their property be returned to them. It was felt that there was much equity in their claim, and the Trading with the Enemy Act was amended to provide for the payment of certain small claims. On the other hand, about $186,000,000 had been found due from Germany to American claimants and established by awards determined by the mixed claims commission which had been created under the treaty of peace with Germany. Germany was a bankrupt nation unable to pay these awards, and loud protests came from the American claimants against paying the German claimants without any provision for the payment of just American claims. The problem before Congress was an extremely difficult one, and although many efforts were made to dispose of it, there were so many different kinds of claims and so many conflicting interests that year after year went by without the legislators being able to agree upon a bill. One of the many serious problems in the case arose from the fact that Germany was unable to make any payment and there were not sufficient funds in the hands of the Alien Property Custodian, even when there was added thereto a

large sum which it was expected would be paid for the German ships and radio stations, to pay both the German claimants and the American claimants at once. Finally the matter was referred to the Ways and Means Committee, which prepared a bill, and a statute was enacted more than twenty-three pages in length which contained provisions for the disposition of the property which was held by the Alien Property Custodian and created a fund out of which the American claimants could be paid. This statute was called the Settlement of War Claims Act and was approved March 10, 1928, 45 Stat. 254, 50 U.S.C.A.Appendix, §§ 9, 10, 20 et seq.

■■■ A consideration of the facts above stated makes it plain that until the law made provision for return of the property none of the alien parties whose property had been seized had any enforceable rights or interest either in the property or against the government by reason of its being so held and whenever this matter has been presented to the courts they have so decided. Whatever rights the former owners subsequently obtained were through and under the War Claims statute which was purely an act of grace on the part of our government. The United States could have retained the property seized, and disposed of it as it saw fit, applied it on taxes, or appropriated it entirely and had it covered into the miscellaneous receipts of the Treasury, regardless of the statutes limiting the collection of taxes. Whatever it did with the money, the former owners would have had no cause of action against the government until some statute was enacted making special provision for the return of the property or a portion of it and then only upon the conditions expressed in such statute.

■ It is argued on behalf of the plaintiffs that the War Claims Act did not repeal the provisions of the statutes with reference to the assessment and collection of taxes, and that as these statutes were not repealed, they were not only in force at the time when the Alien Property Custodian turned the money involved over to the Commissioner but applied directly to the funds in the hands of the Alien Property Custodian, and consequently the disposition of these funds was controlled by the general statutory provisions with reference to taxes. This is clearly an erroneous conclusion. We have already shown that until the War Claims Act became a law the former owners of the property seized had no enforceable rights whatever therein, and when this act was passed they acquired no rights except those granted thereby. The War Claims Act made provision for the payment of taxes and the government having complete right to retain the property, none of the taxing statutes had any application except as specially stated in the act itself.

■ At this point it should be noted that the plaintiffs did not file the only claim for refund made in this case. It was filed by the Alien Property Custodian. Why, we do not know. It would seem self-evident that the Alien Property Custodian was not the agent for the former owner of the property. He was the agent of the government itself and did not act for the plaintiffs in filing the claim for refund. See Opinion of Attorney General, vol. 32, p. 249, 253. The incongruous situation is presented where an agent of the government files a claim against the government. If any one was authorized to file a claim for refund, it would seem to be the plaintiffs; yet the plaintiffs had not paid the tax, it was paid by the Alien Property Custodian out of money over which the government had complete control and the right to appropriate as it saw fit. These features of the case show how difficult, if not impossible, it is to apply the general provisions of the taxing statutes to the case now before us. The attempt to do so leads into all sorts of inconsistencies and presents one of the many reasons why we think Congress had no intention of restricting the right of the government to retain money or property which had been seized by the Alien Custodian by applying the general statutes with reference to the assessment and collection of taxes.

■■ What has been said above, we think shows plainly that plaintiffs' case depends, not upon whether the provisions of the revenue laws with reference to the assessment and collection of taxes were repealed by the War Claims Settlement Act, but upon whether that statute made these provisions applicable in determining the amount which the claimants should receive. The taxes involved were not assessed and collected within the period prescribed by the general provisions of the revenue laws, and if they are applicable in determining whether the money involved in the suit can be retained by the government, it is obvious that plaintiffs are entitled to recover. On the other hand, if the War Claims Settlement Act, as

we think, provided that the taxes should be computed, as if the property had not been seized by the Alien Custodian, and then paid without any further restrictions, the plaintiffs have no foundation for their suit.

Plaintiffs rely largely on section 24 of the Trading with the Enemy Act which was amended by the Settlement of War Claims Act in section 18 thereof, which was headed "Taxes." Section 24 of the Trading with the Enemy Act was made subdivision (a) by the amendment and subdivisions (b) to (f) inclusive were added (50 U.S.C.A.Appendix, § 24(a–f). Section 24 (now subdivision (a), among other things, provided: "The Alien Property Custodian is authorized to pay all taxes * * * heretofore or hereafter lawfully assessed * * * against any money or other property held by him." It did not direct the Alien Property Custodian to pay or turn over anything to the former owners of the property but merely authorized the payment of certain taxes. Subdivision (b) of the amendment (50 U.S.C.A.Appendix § 24(b) reads as follows: "(b) In the case of income, war-profits, excess-profits, or estate taxes imposed by any Act of Congress, the amount thereof shall, under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, be computed in the same manner (except as hereinafter in this section provided) as though the money or other property had not been seized by or paid to the Alien Property Custodian, and shall be paid, as far as practicable, in accordance with subsection (a) of this section. Pending final determination of the tax liability the Alien Property Custodian is authorized to return, in accordance with the provisions of this Act, money or other property in any trust in such amounts as may be determined, under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, to be consistent with the prompt payment of the full amount of the internal-revenue taxes."

It is assumed by plaintiffs that by amending section 24 of the Trading with the Enemy Act in this manner a limitation was placed upon the amount which the government would withhold for taxes and that the money or property which had been seized would be returned in its entirety without any deduction on account of taxes not lawfully assessed. We do not think this construction accords with the language of the amendment and are clear that it is not in harmony with the intention of Congress. The amendment (b), quoted above, does not pertain to the assessment of taxes in any way. On the contrary, it so carefully avoids the use of the word "assessment" that we think it evident Congress took into consideration the fact that there would be taxes due and unpaid but never assessed. Instead of saying that taxes shall not be paid unless lawfully *assessed*, it states they shall "be *computed* in the same manner (except as hereinafter in this section provided) as though the money or other property had not been seized by or paid to the Alien Property Custodian, and shall be paid, as far as practicable, in accordance with subsection (a) of this section." (Italics supplied.) It is expressly provided that the taxes shall be paid, and the words "as far as practicable" did not make the payment depend upon the time when an assessment had been made for this was not a matter of practicability. These words evidently apply to the further provision contained in subdivision (a) that "such taxes * * * shall be paid out of the money or other property against which such taxes are assessed, * * * or (if such money or other property is insufficient) out of any other money or property held for the same person." Subdivision (b) recognizes that at the time of its enactment the taxes may not have been computed or assessed and made the further provision that "pending final determination of the tax liability the Alien Property Custodian is authorized to return, in accordance with the provisions of this Act, money or other property in any trust in such amounts as may be determined, * * * to be consistent with the prompt payment of the full amount of the internal-revenue taxes." This provision evidently contemplates the payment of the "full amount" of the taxes without any restriction or limitation and the return of the property to the claimant less taxes and other charges the deduction of which was authorized.

In addition to what is stated above, it would seem that there is no reason at all for the enactment of subdivision (b) if only taxes lawfuly assessed—that is, assessed in accordance with the general provisions of the taxing acts—were to be paid. An assessment must always be preceded by a computation of the tax, and where the tax had already been assessed in accordance with law no further computation was necessary. As to the taxes that had not been so assessed, there would be no use in making the computation if the construction for which plaintiffs contend is correct and the subsec-

tion could just as well have been entirely omitted. In this connection it should be kept in mind that taxes become due without being assessed.

We think the wording of subdivision (b) requires that where taxes were due from the aliens whose property had been seized they should be computed and withheld without regard to the statute of limitations. If it should be conceded for the sake of the argument that the statute was ambiguous, the surrounding circumstances clearly show that such must have been the intent of Congress. This money or property was turned over purely as an act of grace. In so doing, the United States was not standing upon its war-time rights, but placed the matter on a moral and equitable plane highly favorable to the claimants. Having done this, it seems hardly conceivable that it was intended to turn this property back to the former owners without collecting taxes justly due from them. Our government was intending to do exact justice to the alien claimants, and it would exact no more than justice in requiring these taxes to be paid. Where the intent is manifest and the language ambiguous the intent must control.

We find no decisions that have been made on precisely similar cases. In the case of Chemische Fabrik von Heyden Aktiengesellschaft v. Tait, 58 F.(2d) 814, 815, 818, the District Court of Maryland held that: "the 'Settlement of War Claims Act' was an act of grace of the sovereign United States, and in returning the property this Government undoubtedly had the clear right to impose such terms and conditions as it pleased Congress to enact. The property could have been withheld entirely or confiscated beyond any legal right or remedy of the plaintiff."

The court went on to hold that subdivision (b) and other subdivisions of section 24 of the Trading with the Enemy Act as amended specified the terms and conditions on which the property should be returned to its former owner, and it was said that: "§ 24 (b-f), shows beyond any reasonable doubt that the intention of Congress was to return only the corpus of the property remaining after the payment of taxes and other expenses thereout. * * * Obviously the intention was to make the property subject retroactively to taxes for the designated years. If, therefore, the tax had not previously been paid by the Alien Property Custodian, it was the intention of this legislation to require the determination and payment of the tax before the return of the property to the former alien enemy."

The case last cited differed from the case at bar in that it appeared that the deputy collector had made a return of the taxes which were assessed within the statutory period, but we do not think this makes any difference with the principle announced by the District Court, which also observed that it seemed "highly doubtful if the plaintiff in its own name has any standing whatever in court to recover a tax paid by the Custodian to the Collector of Internal Revenue." But the court did not find it necessary to rule on this question, or upon whether the plaintiff in that case could avail itself of the claim of refund filed by the Custodian. We think it could not, for, as above stated, the Custodian was not the agent of plaintiffs. On the other hand, we do not think there was any necessity for the filing of a claim for refund in the case now under consideration. If plaintiffs are entitled to have the money for which they sue paid over to them, it is because the Settlement of War Claims Act (contrary to our construction) provided that this should be done and they needed no claim for refund.

Counsel for plaintiffs call attention to a ruling of the general counsel of the Bureau of Internal Revenue in which it was held that the Settlement of War Claims Act did not abrogate the general statute of limitations applicable to the assessment and collection of an internal revenue tax, but if we are correct in what has been stated above, an erroneous basis was taken for the ruling. We have already shown that the omission from the Settlement of War Claims Act of any provision repealing the general provisions relating to the assessment and collection of taxes did not make them applicable to the money in the hands of the Custodian. It required a special provision in the Settlement of War Claims Act to make them applicable. This ruling, however, is not very material, as the Bureau did not adhere to it, and it seems to have been withdrawn.

Under our view of the law applicable to the case the plaintiffs' petition must be dismissed, and it is so ordered.